IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-02222-MSK-MEH

DELBERT L. ARCHULETA,

       Plaintiff,

v.

BLAC-FRAC TANKS, INC., a Colorado corporation,

       Defendant.

---

## PROPOSED SCHEDULING ORDER

---

### 1.  DATE OF CONFERENCE AND APPEARANCES OF COUNSEL

The Scheduling Conference in the above case was held on November 4, 2014 at 10:15 a.m.  Appearing on behalf of Plaintiff Delbert L. Archuleta was Robert J. Truhlar and Jacob S. Allen, of Truhlar and Truhlar, L.L.P. 7340 East Caley Avenue, Suite 310, Centennial, Colorado 80111, 303-794-2404.  The Defendant Blac-Frac Tanks, Inc. was represented by Michael Santo, of Bechtel & Santo, LLP 205 North 4th Street, Suite 300, Grand Junction, Colorado 81501, 970-683-5888.

### 2.  STATEMENT OF JURISDICTION

This Court has original jurisdiction over Plaintiff's federal claims contained in the complaint pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) and (4), and 29 U.S.C. § 621.  Specifically, this Court has jurisdiction pursuant to the enforcement provisions of the Age Discrimination in Employment Act.  The Court may also exercise supplemental jurisdiction over Plaintiff's state common law claims pursuant to 28 U.S.C. § 1367.

### 3. STATEMENT OF CLAIMS AND DEFENSES

**a. Plaintiff:**

Plaintiff Delbert Archuleta ("Mr. Archuleta") was hired by Blac-Frac Tanks, Inc. ("Blac-Frac") in September 2005 as the Fabrication Manager.  As the Fabrication Manager, Mr. Archuleta oversaw Blac-Frac's Colorado welding operations including supervising between six and eight welders depending on the number of employees in the welding department at any given time.

Mr. Archuleta performed high quality welding work and effectively managed the welding department for more than seven years until May 13, 2013, when he was demoted from the position of Fabrication Manager to Welder.  As the Fabrication Manager, Mr. Archuleta earned a salary of $90,000.00 per year and when he was demoted to the position of Welder he was paid $26.00 per hour.  The Welder hourly rate of $26.00 per hour equates to $54,080.00 per year.  This 40% decrease in yearly compensation was designed to force Mr. Archuleta out of Blac-Frac and to pressure him into resigning.  Not only did Blac-Frac decrease his yearly compensation by 40%, but they also intentionally isolated Mr. Archuleta.

In May 2013, when Mr. Archuleta was told that he was being demoted, Ms. Cathy Snow, Co-Owner of Blac-Frac, told him "You'd better take this demotion, because at your age you aren't going to be able to get another job."  Mr. Ralph Snow, Co-Owner of Blac-Frac told Mr. Archuleta, "I hoped that we could all retire from Blac-Frac, but with these kids running the company, that's not going to be able to happen."

As the Fabrication Manager from September 2005 until May 13, 2013, Mr. Archuleta worked at Blac-Frac's Parachute, Colorado worksite where approximately 20

other employees worked including all of Blac-Frac's Colorado welders.  After Blac-Frac

demoted Mr. Archuleta on May 13, 2013 they told him he would be assigned to a

separate worksite, but that Blac-Frac needed time to find a separate site for him.    On

or about July 8, 2013 Blac-Frac assigned Mr. Archuleta to work at a site in Palisade,

Colorado, approximately 34 miles from Blac-Frac's other employees, in a cramped

garage facility where Mr. Archuleta was the only employee.  This decrease in salary and

deliberate isolation of Mr. Archuleta was designed to force him out of the company and

create such an intolerable working environment that Mr. Archuleta would resign.

However, rather than resign, Mr. Archuleta made it clear that he would protect his

statutory and contractual rights.  The Blac-Frac Employee Handbook has a specific

section that covers various anti-discrimination and harassment policies.  In this section,

"Policy 130 – Discrimination and Harassment Prohibition" states:

> **10. Reporting Discrimination or Harassment.**  <u>Any employee who is subjected
> to or who observes conduct that the Employee honestly believes is in violation
> of this policy should report it to Ralph Snow</u>, Cathy Snow or Director of Human
> Resource [sic].  This includes conduct by co-workers, supervisors, management,
> officers or directors, agents, clients, suppliers or others encountered during the
> course and scope of your employment.  It is Employer's desire to maintain a
> professional working environment and to prevent any unlawful discrimination
> or harassment in employment.  <u>Employees are strongly advised that they  should
> not  quit  employment  because  of  conduct  that  violates  this  policy  rather  than
> reporting  such  conduct.</u>  Please give Employer a reasonable opportunity to
> investigate and correct any violations of this policy.  <u>Upon receiving a report of
> conduct that may violate this policy, Employer will investigate the circumstances
> and take appropriate action.</u> (emphasis added).

Mr. Archuleta was demoted because of his age and in accord with that

understanding he followed the above policy and notified Mr. Ralph Snow of that

understanding.  On July 12, 2013 Mr. Archuleta wrote and sent via Certified Mail a letter

to Mr. Ralph Snow that stated the following:

Mr. Snow,

I am writing in regards to my recent demotion.  I believe that I was illegally demoted in violation of the Age Discrimination in Employment Act, the Colorado Anti-Discrimination Act, and other applicable laws.  I request that any further discrimination immediately stop, that I not be subjected to further adverse employment actions, and that I be promptly placed back in my former position with full pay.

Due to this illegal discrimination, I plan to file a Charge of Discrimination with the Colorado Civil Rights Division and/or the Equal Employment Opportunity Commission.

Regards,

Delbert Archuleta

Mr. Archuleta received no written response from Mr. Ralph Snow, so after waiting one week, Mr. Archuleta resent the same letter via e-mail on July 20, 2013 to Mr. Ralph Snow the Co-Owner of Blac-Frac, Mr. Chris Snow the Office Manager, and Ms. Tina Palumbo the Human Resource Manager.  In response, Mr. Ralph Snow then sent out an email to Mr. Archuleta, Mr. Chris Snow and Ms. Palumbo stating the following:

That is a threat, his demand that he be placed back in his position is not acceptable.  I do have the voice mail where he accepted our offer letter to place him in an off-site facility.  We need this over to our attorney on Monday.  Tina, Does he have a case. [sic]

Mr. Archuleta never received a direct written response to his July 12 and 20, 2013 letters nor was an investigation ever conducted into his complaints of age discrimination.  After waiting several weeks for a direct response and investigation into his complaints of age discrimination, Mr. Archuleta filed a charge of age discrimination with the Equal Employment Opportunity Commission on August 16, 2013.

After being demoted and isolated at the Palisade location, Mr. Archuleta was tasked with welding steel nineteen and one-half foot long ladders weighing 520 pounds

for Blac-Frac's hydraulic fracturing tanks.  Blac-Frac had numerous welders and its entire Colorado welding operations at its Parachute location, yet they intentionally isolated Mr. Archuleta in a location where he was by himself to create an intolerable working environment.  The Palisade worksite was never used by Blac-Frac prior to Mr. Archuleta's assignment there and after Mr. Archuleta was terminated the site was closed and no other work is conducted there by Blac-Frac.  At the Palisade worksite, Mr. Archuleta was forced to work alone in a small garage that had not been properly prepared to ensure safe welding.  Blac-Frac never conducted any type of safety or hazard analysis of the Palisade worksite before Mr. Archuleta was sent there to weld and operate machinery.  The garage did not have proper ventilation for welding, so it would quickly fill up with noxious fumes that endangered Mr. Archuleta's health.

Mr. Archuleta was directed to weld in this inadequately ventilated space.  Mr. Archuleta repeatedly brought these unsafe conditions to the attention of Blac-Frac.  The garage also had inadequate cooling and the temperature inside would exceed 100 degrees while Mr. Archuleta was working in July and August 2013.

Additionally, the location where Mr. Archuleta was assigned to work had a garage door that would become frozen and inoperable in cold temperatures and the only other exit would become frozen and blocked with snow.  Mr. Archuleta repeatedly requested a snow shovel so that he could clear snow from the only exit door, but these requests were ignored for months on end.  The worksite flooded twice in 2013 due to heavy rain and the worksite flooded in January 2014 due to snow melt.  The Palisade worksite had exposed electrical wires that made it an unsafe worksite.  The Palisade location had no areas for storage of Mr. Archuleta's work materials including steel

beams, which created a tripping hazard.  On at least two occasions in November 2013,

Mr. Archuleta complained to Mr. Mark Nave, Blac-Frac's Safety Manager about the

unsafe conditions at the Palisade site.  On at least three occasions in December 2013

Mr. Archuleta complained to Mr. Nave about the unsafe conditions at the Palisade site.

On November 29, 2013, after inspecting the Palisade worksite, Ms. Snow, Blac-

Frac Co-Owner, specifically told Mr. Archuleta that "this shop was rented to create a

mental hardship on you."  Ms. Snow went on in that same conversation to tell Mr.

Archuleta that Blac-Frac was trying to isolate him, was trying to keep Mr. Archuleta from

having contact with any other Blac-Frac employees, and Blac-Frac was trying to get rid

of him due to his age.

When Mr. Archuleta worked at the Parachute location, the steel nineteen and

one-half foot long ladders weighing 520 pounds were moved using either a Gradall

Telehandler ("Telehandler") or a John Deere Skid Steer ("Skid Steer").  A Gradall

Telehandler is a four wheel rigid frame, engine powered machine with a telescopic

boom that can extend forwards and upwards from the vehicle, which includes an inner

cage in which the operator sits while operating the Telehandler.  A Skid Steer is a four

wheel rigid frame, engine powered machine with lift arms used to attach a wide variety

of labor saving attachments that includes an inner cage in which the operator sits while

operating the Skid Steer.  When Mr. Archuleta was demoted and transferred from

Parachute to Palisade he was directed to bring the John Deere Skid Steer ("Skid Steer")

to the Palisade location, so that he could use the Skid Steer to move the steel nineteen

and one-half foot long ladders weighing 520 pounds.

The Skid Steer was owned by Mr. Archuleta and he leased it to Blac-Frac beginning in 2004.  Mr. Archuleta leased and Blac-Frac paid for use of the Skid Steer from 2004 until August 2013 without any issue.  In June 2012, Mr. Archuleta came to an agreement with Mr. Chris Snow to base the lease price of the Skid Steer on the average use over the previous year, which equated to a monthly lease payment of $1,800.00. Blac-Frac paid Mr. Archuleta the $1,800.00 per month from June 2012 until August 2013 without issue.  However, after Mr. Archuleta filed his charge of age discrimination with the Equal Employment Opportunity Commission on August 16, 2013, Blac-Frac retaliated against him and changed the lease agreement.  On September 1, 2013, Mr. Ralph Snow sent to Mr. Archuleta a letter informing him that Blac-Frac would no longer pay $1,800.00 per month, but would only pay for the documented use of the Skid Steer with a maximum payment of $400.00 per month.  In November 2013, Blac-Frac required Mr. Archuleta to remove the Skid-Steer from the Palisade worksite, so he was then working alone and had no mechanical assistance to move the steel nineteen and one-half foot long ladders weighing 520 pounds.

After Mr. Archuleta's repeated complaints regarding safety were ignored, Mr. Archuleta made a complaint to the Occupational Safety and Health Administration on December 2, 2013.  Mr. Archuleta complained to the Occupational Safety and Health Administration that he was being asked by Blac-Frac to move steel nineteen and one-half foot ladders weighing 520 pounds by himself, without mechanical assistance in a worksite that would fill with noxious fumes when he was welding.  Only after the Occupational Safety and Health Administration complaint did Mr. Nave hang fire extinguishers in the garage on December 13, 2013, despite the fact that Mr. Archuleta

had been welding in that space for approximately 6 months.  Rather than address the ventilation issues in the garage, Blac-Frac provided Mr. Archuleta with a "fume extractor" that had a hose that was too short to stay attached while Mr. Archuleta was working and did not adequately remove fumes from the workspace.

Beginning on December 2, 2013, later in the day from Mr. Archuleta's Occupational Safety and Health Administration complaint and after Blac-Frac was informed by the Occupational Safety and Health Administration of the complaint; Mr. Nave brought in to the Palisade location and directed Mr. Archuleta to operate a Crown Heavy Duty Walkie Stacker ("Walkie Stacker.") The Walkie Stacker is not a vehicle with a protective cage, but a lift that an operator walks behind and next to and it has no protective features to prevent items from falling on the operator.

The Walkie Stacker had forks that had holes drilled through them, an inoperable horn, no fire extinguisher attached to it, and a "homemade" boom that was unsafe to operate.  Additionally, the Walkie Stacker had two capacity tags attached to it.  A capacity tag is a tag that is placed on a piece of machinery to describe the load, load center and lift weight capacity for the safe operation of that machinery.  The two capacity tags listed different load, load center, and lift weight capacity information, which were inconsistent with each other.

Mr. Nave directed Mr. Archuleta to operate this unsafe Walkie Stacker in the garage worksite where the ceiling was not high enough to safely operate the Walkie Stacker.  Additionally, the worksite had multiple hazards that made operating a Walkie Stacker in these confined quarters unsafe. These hazards included the presence of a chop saw, steel beams that were unsecured, exposed electrical wiring, and repeated

8

flooding of the workspace.  Additionally, one of the factory installed safeguards on the Walkie Stacker had been removed by Blac-Frac prior to directing Mr. Archuleta to operate it.

On December 2, 2013, Mr. Nave directed Mr. Archuleta to operate the Walkie Stacker.  Prior to December 2, 2013, Mr. Archuleta had never been trained on operation of the Walkie Stacker.  Mr. Archuleta raised this concern to Mr. Nave.  Mr. Nave responded that he would train Mr. Archuleta on the operation of the Walkie Stacker. However, prior to December 2, 2013 Mr. Nave himself had never received training on the safe operation of the Walkie Stacker.  On December 2, 2013 Mr. Nave stated that Mr. Archuleta would be disciplined for not running the Walkie Stacker.  When Mr. Archuleta later asked to see the written discipline, Mr. Nave refused and told Mr. Archuleta that the written discipline was in Ms. Tina Palumbo's files.

Later in the day on December 2, 2013, Ms. Cathy Snow told Mr. Archuleta during a telephone call that Blac-Frac would not contest his unemployment benefits if he would just resign.  Mr. Archuleta refused to take this illegal deal.  Ms. Snow also told Mr. Archuleta, "You're making it too hard for them to fire you" referring to Mr. Archuleta's charge of discrimination filed with the Equal Employment Opportunity Commission and his complaint to the Occupational Safety and Health Administration.

Despite his concerns about the safety of operating the Walkie Stacker, Mr. Archuleta agreed to be trained on the Walkie Stacker's operation so that he could operate it in case of emergency or if another employee was injured while attempting to operate it.  Accordingly, on December 23, 2013 Mr. Archuleta participated in training on the use of the Walkie Stacker conducted by Arnold Machinery.  Mr. Nave participated in

that same training on December 23, 2013 because he had never been trained on the use of the Walkie Stacker prior to that date.  During training on December 23, 2013 Mr. Archuleta attempted to use the Walkie Stacker, but while operating it in such a small space, the mast hit one of the ceiling beams in the garage.  Despite this obvious danger and hazard, Mr. Nave continued to pressure Mr. Archuleta to operate the Walkie Stacker.

**When Blac-Frac brought in its own inspector to inspect the Walkie Stacker in December 2013, the inspector confirmed to Mr. Nave that the Walkie Stacker should not be operated in such a workspace and that the forks were too long and that the "homemade" boom should not be used**.  Mr. Nave assured the inspector that the Walkie Stacker would be removed from the worksite, but that never happened. Instead, Mr. Nave continued to give Mr. Archuleta various unsubstantiated assurances that it was an Occupational Safety and Health Act compliant piece of equipment, but never addressed that one of the most dangerous aspects of running the Walkie Stacker was the confined space with various hazards that he asked that it be operated within.  In fact, in one of the tense exchanges between Mr. Nave and Mr. Archuleta, Mr. Nave stated "OSHA isn't your friend."

Despite the isolation and harsh conditions, including being directed to operate unsafe equipment, Mr. Archuleta did not resign so Blac-Frac then started focusing on documenting a way to terminate Mr. Archuleta.  One step in that process was bringing in an outside consultant, Ms. Stefani Conley of Succeed at Management, to meet with Mr. Archuleta.  Ms. Conley sought to document Mr. Archuleta's refusal to run a piece of equipment that he felt was unsafe.  Ms. Conley was used by Blac-Frac to create a

10

"paper trail" of documentation regarding Mr. Archuleta's refusal to operate equipment as pretext to terminate Mr. Archuleta on the basis of his age, retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission and in retaliation for making complaints to the Occupational Safety and Health Administration.

Mr. Archuleta's termination letter dated February 19, 2014 states that he was terminated because he "refused to receive training regarding the proper use of equipment and refused to perform [his] assigned duties."  This explanation is patently false and is a pretext for age discrimination.  Mr. Archuleta, despite his great safety concerns, did receive training on the use of the Walkie Stacker because he wanted to know how to run it in case of emergency.  Also, Mr. Archuleta did refuse to use the Walkie Stacker because of the confined and dangerous space it was supposed to be operated within, but he still performed all of his job duties including all of his welding duties without use of the Walkie Stacker.  Mr. Archuleta was terminated because of his age and in retaliation for filing a charge of age discrimination with the Equal Employment Opportunity Commission.  Furthermore, Blac-Frac intentionally inflicted emotional distress on Mr. Archuleta through its outrageous conduct.

**b.  Defendant:**

Blac Frac denies that it discriminated against Mr. Archuleta on the basis of his age, that it retaliated against him for filing a complaint with the Equal Employment Opportunity Commission, that it breached any alleged contract with him, or that it engaged in extreme and outrageous conduct.

Instead, Blac Frac transferred Mr. Archuleta to a welding position in Palisade, Colorado after it determined that he repeatedly engaged in rude, insolent, and offensive

conduct, despite numerous training sessions, meetings, etc. designed to improve the manner in which Mr. Archuleta communicated and interacted with other employees.  For example, in May 2014, an Assistant Manager came across Mr. Archuleta in a lunch area and asked Mr. Archuleta how he was doing.  Mr. Archuleta told this employee that "the fucking people who are running this place don't know what there [sic] doing, and I ain't [sic] afraid to say it."  Mr. Archuleta added: "I don't like your fucking boss, and he fuckin' knows it."  The employee was very uncomfortable with the encounter and reported it to Ms. Palumbo in Human Resources and Operations Manager Chris Snow.

Thereafter, in December 2013, Blac Frac provided Mr. Archuleta with a forklift to use at the Palisade location.  This equipment was provided to Mr. Archuleta to move ladders and materials, if needed.  The Safety Manager, Mark Nave, intended to train the claimant on the use of the forklift.  The claimant refused to receive the training and also refused to use the forklift.  Eventually, Mr. Archuleta agreed to be trained on the equipment.  But even after receiving the training, the claimant continued to refuse to operate the forklift.  Blac Frac offered the Mr. Archuleta additional training on the forklift to help him feel safer about operating it.  But Mr. Archuleta continued to refuse receive training.

Because of Mr. Archuleta's persistent refusal to participate in Mr. Nave's training or to perform his assigned job duties even after receiving the written reprimands and discussing the issues, Blac-Frac terminated Mr. Archuleta on February 19, 2014.

Blac Frac also incorporates the other defenses and affirmative defenses pleaded by it in its Answer to the Complaint filed by Plaintiff.

## 4. UNDISPUTED FACTS

The following facts are undisputed:

1. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

2. Blac-Frac is a for-profit corporation incorporated in the State of Colorado.

3. Mr. Archuleta's date of birth is August 30, 1953.

4. Mr. Archuleta's hourly wage as Welder was $26.00.

5. Mr. Archuleta was terminated from Blac-Frac on February 19, 2014.

6. At the time Mr. Archuleta was terminated from Blac-Frac he was sixty years old.

7. Mr. Archuleta was employed with Blac-Frac Tanks, Inc. from September 2005 until his termination on February 19, 2014.

8. Blac-Frac employs more than twenty employees.

9. Mr. Ralph Snow is a Co-Owner of Blac-Frac.

10. Ms. Cathy Snow is a Co-Owner of Blac-Frac.

11. Ms. Cathy Snow is Mr. Archuleta's sister.

12. Mr. Ralph Snow is Mr. Archuleta's brother-in-law.

13. Mr. Chris Snow is Mr. Ralph Snow and Ms. Cathy Snow's son.

14. Mr. Chris Snow is Mr. Archuleta's nephew.

15. Ms. Tina Palumbo is the Human Resources Manager of Blac-Frac.

16. Ms. Palumbo is Mr. Ralph Snow and Ms. Cathy Snow's daughter.

17. Ms. Palumbo is Mr. Archuleta's niece.

18. Mr. Mark Nave is Blac-Frac's Safety Manager.

19. While working at the Parachute facility, Mr. Archuleta had access and was able to attend daily safety meetings, which covered different safety topics.

20. Prior to his assignment at the Palisade location, when Mr. Archuleta worked at the Parachute location a Skid Steer was used to move the ladders that were welded at that location.

21. When the Skid Steer was not used to move ladders at the Parachute location a Gradall telescopic handler ("Telehandler") was used to move the ladders.

22. Mr. Arnulfo Torrez ("Mr. Torrez") is a Blac-Frac employee.

23. On December 2, 2013 Mr. Nave, Blac-Frac's Safety Manager, came to the Palisade location with Mr. Torrez.

24. Mr. Nave brought with him a Crown Heavy Duty Walkie Stacker ("Walkie Stacker.")

25. On December 2, 2013 Mr. Nave stated that he would train Mr. Archuleta on the Walkie Stacker.

### 5. COMPUTATION OF DAMAGES

**a. Plaintiff:**

Mr. Archuleta is seeking to recover his economic damages.  Mr. Archuleta's salary at the time he was demoted from Fabrication Manager to Welder was $90,000.00 per year, plus a benefit package, the exact value of which is to be determined.  Mr. Archuleta was on track to continue to receive raises if he continued as Fabrication Manager at Blac-Frac Tanks, Inc.

Mr. Archuleta's rate of pay at the time he was terminated from Blac-Frac Tanks, Inc. was $26.00 per hour, plus a benefit package, the exact value of which is to be determined.

Mr. Archuleta intended to continue working as the Fabrication Manager until the age of 70.

Mr. Archuleta's estimate of the amounts of his losses as of July 31, 2014 are calculated as follows:

|  | 2013 | 2014 | 2015 (Reinstatement) | 2016-2023 |
|---|---|---|---|---|
| Projected Earnings as Fabrication Manager | $90,000 | $90,000 | $90,000 | $720,000 |
| Actual Earnings | $61,785 | $7,280 | Unknown because reinstatement date is unknown | To be determined |
| Damages | $28,215 | $82,720 | $90,000 | $720,000 |
| **Cumulative Damages** | $28,215 | $110,935 | $200,935 | $920,935 |

1.      Estimated back wages and benefits:  Approximately $200,935

2.      Liquidated Damages for Willful Violation of the Age Discrimination in Employment Act: $200,935

3.      Economic loss due to breach of contract: Approximately $920,935

4.      Attorney fees and interest:  Mr. Archuleta seeks an award of reasonable attorney fees (estimated to be at least $200,000 through a trial), reasonable expert witness fees, other costs of this action, and any judgment interest applicable by law.

5.　　　　Mr. Archuleta is seeking compensation for non-pecuniary losses, including

emotional distress, pain, suffering, inconvenience and mental anguish to be

determined by a jury.

6.　　　　Mr. Archuleta is seeking an award of punitive damages.

**b.  Defendant:** Blac Frac denies that Mr. Archuleta is entitled to any legal, equitable,

or injunctive relief in any amount or manner whatsoever from Blac Frac.  Blac Frac

request this Court to award Blac Frac its costs and reasonable attorney fees incurred in

defending against such claims because all the claims set forth in the Complaint lack

substantive justification and are frivolous and vexatious.

## 6. REPORT OF PRECONFERENCE DISCOVERY AND MEETING UNDER

## FED.R.CIV.P. 26(f)

a.　　　In accordance with Fed.R.Civ.P. 26(f) and the Order Setting Scheduling/Planning

Conference, counsel held their pre-scheduling conference meeting via telephone

beginning on October 2, 2014 and completed the Conference via telephone on October

13, 2014.

b.　　　Those participating in the meeting were:

　　　　　　For the Plaintiff:　　　　Robert J. Truhlar and Jacob S. Allen

　　　　　　For the Defendant:　　　Michael Santo

c.　　　In accordance with Fed.R.Civ.P. 26(a)(1) the plaintiff served initial disclosures on

October 27, 2014, which included 3,038 documents.  As of the time of filing the

proposed Scheduling Order plaintiff has not received initial disclosures from defendant.

d.　　　The parties have no proposed changes to the timing or requirement of

disclosures under Fed.R.Civ.P. 26(a)(1).

e.      The parties have agreed to engage in informal discovery to the extent

practicable, including discussing the interviewing of Blac Frac employees.

f.      The parties have agreed to attempt to reduce discovery and other litigation costs

throughout the course of this case, including the use of a unified exhibit numbering

system.

g.      The parties anticipate there will be electronically stored information ("ESI")

relevant to this lawsuit.  The parties submit that the following steps have been taken to

comply with the obligation to preserve ESI.

    i.      **Plaintiff:**  Plaintiff has taken appropriate steps to preserve ESI relevant to

        this lawsuit by printing all email correspondence with Blac-Frac in his

        possession.  Plaintiff sent to the Defendant on March 28, 2014 a

        Preservation of Documents letter.

    ii.      **Defendant:**

        Blac Frac states that it has taken appropriate steps to preserve all

        documents and electronically stored information relevant to this lawsuit.

The parties have agreed that all documents produced in this case will be produced in a

searchable PDF format where possible with documents in their original, native, format

being available for inspection upon request.

h.      The parties have discussed the possibility of promptly settling the case. The

Plaintiff believes this case is well suited for early settlement; however, the Defendant

does not agree and believes that no mediation should be held until some discovery is

conducted.

## 7. CONSENT

The parties discussed the use of a Magistrate Judge pursuant to

D.C.COLO.LCivR 72.2 and 28 U.S.C. § 636(c)(1), the parties do not consent to use of a

Magistrate Judge and  filed the required Consent Form on October 20, 2014

All parties have not consented to the exercise of jurisdiction of a magistrate

judge.

## 8. DISCOVERY LIMITATIONS

a.  The parties may each take up to 10 depositions per side, without leave of

court.

b.  Depositions are limited to 7 hours per deposition.

c.  There are no modifications to the presumptive number of interrogatories per

party contained in the federal rules.

d.  There are no modifications to the presumptive number of requests for

production of documents per party contained in the federal rules.

e.  There are no modifications to the presumptive number of request for

admissions per party contained in the federal rules.

## 9. CASE PLAN AND SCHEDULE

a.      Deadline for Joinder of Parties and Amendment of Pleadings: January 21, 2015.

b.      Discovery Cut-off:  June 9, 2015

c.      Dispositive Motion Deadline:  July 14, 2015

d.      Expert Witness Disclosure

1.  The parties anticipate expert testimony in the area of economic damages and

workplace safety.

2. The parties do not propose a limit on the number of expert witnesses.

3. The parties shall designate all experts and provide opposing counsel and any pro se parties with all information specified in Fed. R. Civ. P. 26(a)(2) on or before April 10, 2015.

4. The parties shall designate all rebuttal experts and provide opposing counsel and any pro se party with all information specified in Fed. R. Civ. P. 26(a)(2) on or before May 12, 2015.

e. Identification of Persons to Be Deposed:

Plaintiff's Depositions:

| Name of Deponent | Date of Deposition (Proposed by Plaintiff, not confirmed by Defendant)* | Time of Deposition | Expected Length of Deposition |
|---|---|---|---|
| Ralph Snow | January 12, 2015 | 9:00 a.m. | 7 hours |
| Cathy Snow | January 15, 2015 | 9:00 a.m. | 7 hours |
| Mark Nave | January 13, 2015 | 9:00 a.m. | 7 hours |
| 30(b)(6) | January 9, 2015 | 9:00 a.m. | 7 hours |
| Chris Snow | January 19, 2015 | 9:00 a.m. | 7 hours |
| Tina Palumbo | January 14, 2015 | 9:00 a.m. | 7 hours |
| Arnulfo Torrez | January 21, 2015 | 9:00 a.m. | 7 hours |
| Stefani Conley | January 16, 2015 | 9:00 a.m. | 7 hours |
| Pinnacol Assurance | January 20, 2015 | 9:00 a.m. | 7 hours |

| | | | |
|---|---|---|---|
| Representative that inspected the Crown Heavy Duty Walkie Stacker on or about December 23, 2013 | | | |
| Delbert Archuleta | | | 7 hours |

\* The parties are in the process of scheduling the identified depositions identified to occur in January 2015.  The parties reserve the right to add, delete, or otherwise modify the persons listed for deposition.

**f.       Deadline for Interrogatories:**    The parties are not in agreement about the Deadline for Interrogatories.  The plaintiff requests that each party shall submit any requests for interrogatories at least 60 days prior to the discovery completion date in paragraph 9(b) to allow for consideration of objections, conferral and follow-up motions, if necessary.  The defendant requests that each party shall submit any requests for interrogatories at least 45 days prior to the discovery completion date in paragraph 9(b).

**g.    Deadline for Requests for Production of Documents and/or Admissions**:

The parties are not in agreement about the Deadline for Requests for Production of Documents and/or Admissions. The plaintiff requests that each party shall submit any sets of Requests for Production and/or Requests for Admissions at least 60 days prior to the discovery completion date in paragraph 9(b) to allow for consideration of objections, conferral and follow-up motions, if necessary. The defendant requests that each party shall submit any sets of Requests for Production and/or Requests for Admissions at least 45 days prior to the discovery completion date in paragraph 9(b).

**h.     Other Planning or Discovery Orders:**

1.      It is ordered that either party may make a secondary audio and/or video recording of all depositions with notice pursuant to Fed.R.Civ.P. 30(b)(3) with the Parties' understanding that the court reporter's transcript and the video are the only official record.  The recording shall go off when the deposition is off the record.  The other party shall be made a copy of the recording at her or its own expense upon request.

## 10. DATES FOR FURTHER CONFERENCES

a. Status conferences will be held in this case at the following dates and times:

_____.

b. A final pretrial conference will be held in this case on_____ at_____ o'clock _.m. A Final Pretrial Order shall be prepared by the parties and submitted to the court no later than seven (7) days before the final pretrial conference.

## 11. OTHER SCHEDULING MATTERS

a.      The parties, after a good faith effort, are unable to reach an agreement regarding the dates for depositions, deadline for submitting final requests for production and/or admissions, and the deadline for submitting final interrogatories.

b.      Counsel anticipate a 7 day trial to a jury.

## 12. NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with D.C.COLO.LCivR 6.1D by submitting proof that a copy of the motion has been served upon the moving attorney's client, all attorneys of record, and all *pro se* parties.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

With respect to discovery disputes, parties must comply with D.C.COLO.LCivR 7.1A.

In addition to filing an appropriate notice with the clerk's office, a *pro se* party must file a copy of a notice of change of his or her address or telephone number with the clerk of the magistrate judge assigned to this case.

In addition to filing an appropriate notice with the clerk's office, counsel must file a copy of any motion for withdrawal, motion for substitution of counsel, or notice of change of counsel's address or telephone number with the clerk of the magistrate judge assigned to this case.

## 13. AMENDMENTS TO SCHEDULING ORDER

This Scheduling Order may be altered or amended only upon a showing of good cause.

DATED this _____ day of _____, 2014.

BY THE COURT:


_____
United States Magistrate Judge

APPROVED:

s/ Robert J. Truhlar
Robert J. Truhlar
Jacob S. Allen
Truhlar and Truhlar, L.L.P.
7340 E. Caley Avenue, Suite 310
Centennial, CO 80111
Phone: 303-794-2404
Fax: 303-794-1142
Email: roberttruhlar@att.net
        jallen.truhlar@gmail.com
Attorneys for Plaintiff

s/ Michael Santo
Michael Santo
Bechtel & Santo, LLP
205 North 4th Street, Suite 300
Grand Junction, CO  81501
Telephone: 970-683-5888
Fax:  970-683-5887
Email: santo@bechtelsanto.com
Attorney for Defendant